18 A.3d 1128

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Darien HOUSER, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 20, 2009.

Decided April 29, 2011.

Bernard L. Siegel, Philadelphia, for Darien Houser.

Hugh J. Burns, Philadelphia District Attorney's Office, Philadelphia, Amy Zapp, Harrisburg, for Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, JJ.

## *OPINION*

Justice EAKIN.

This is a direct appeal from a sentence of death following appellant Darien Houser's conviction of first degree murder for killing Sergeant Joseph LeClaire. We affirm the conviction and the sentence.

*Background*

A warrant was issued for appellant after he failed to appear for a rape trial. Sergeant Vincent DeSandro of the First Judicial District Warrant Unit was assigned the warrant and learned appellant was likely residing in Apartment 336 of a complex known as Fisher's Crossing at 4901 Old Stenton Avenue, Philadelphia. Sergeant DeSandro requested his partner Officer Eric Jones, Sergeant LeClaire, and Officer Carlo Del Borrello to assist him in executing the warrant. Sergeant LeClaire and Officer Del Borrello wore the required Warrant Unit uniform, which consisted of cargo pants, a shirt identifying them as officers in the Warrant Unit, a ballistics vest and cover containing the phrase "Warrant Unit" on both the front

and back, and a baseball hat or wool cap with the phrase "Warrant Unit" on it. Sergeant DeSandro and Officer Jones, assigned to the FBI Fugitive Task Force, wore civilian clothing with ballistics vests with "Warrant Unit" on the front and back, along with their badges.

The officers met near the apartment complex shortly before 2:00 a.m. on March 19, 2004. Philadelphia Police were called to assist and positioned themselves at the rear of the complex. As the Warrant Unit approached Apartment 336, they heard movement inside. After an initial knock on the door, the noise stopped. One of the officers covered the peephole, and the police pounded on the door, identifying themselves and their purpose.

Appellant and his girlfriend, Naki Hutchinson, were inside the apartment, Hutchinson in the kitchen and appellant in the bedroom. Hutchinson told appellant someone was at the door, telling him it was either the police due to a noise complaint or an acquaintance playing a joke on them. Appellant instructed her not to open the door because it was the police. Nevertheless, Hutchinson heard the officers identify themselves and opened the door.

Sergeant LeClaire entered first and informed Hutchinson he had a warrant for appellant. Sergeant DeSandro was directly behind him, followed by Officers Del Borrello and Jones. Inside the apartment, the kitchenette light was on, as well as a television and an aquarium light. Light from the exterior hallway also entered the apartment as Officer Del Borrello held the door open. The officers were only a few feet inside the door and approximately 14 to 15 feet from the bedroom when Sergeant LeClaire was heard to tell appellant to drop his weapon. At the same time, Sergeant DeSandro saw a barrel flash in the bedroom and sustained a gun shot wound to his left wrist.[1] Sergeant LeClaire returned fire.

1. The Commonwealth's ballistics expert testified the trajectory of one of the bullets fired from appellant's gun originated from the bedroom and passed through the location where the warrant package was found. The termination point was not found; however, evidence indicated the

Officer Del Borrello, at the threshold of the apartment, heard Sergeant LeClaire repeatedly direct appellant to put his gun down; he also heard him call for help, saying he was hit and "officer down."

Officers Del Borrello and Evans removed Sergeant DeSandro to the exterior hallway. Officer Del Borrello later heard appellant reloading bullets into a magazine; appellant then attempted to run out the front door. As appellant neared the front door, he shot Officer Del Borrello in the abdomen. Officer Del Borrello returned fire as he ran past the front door on his way to seek cover and assistance down the hallway. As appellant extended his arm and gun into the hallway, Officer Jones began to fire, causing appellant to return into the apartment. At least one more shot was heard coming from inside the apartment.

Philadelphia Police began arriving on the scene, including the two officers who were assigned to the rear of the apartment complex. Sergeant Frank Hayes arrived while gunfire was still being exchanged and positioned himself outside the apartment. After a lull in the gunfire, Sergeant Hayes entered the apartment; he found a living room window was open with its security bars wrenched from the wall. He also saw Sergeant LeClaire on his knees at the end of a sofa with a large blood spot on the left side of his head. Sergeant Hayes proceeded to search the apartment for appellant, while other officers attended to Sergeant LeClaire. Appellant was not found in the apartment. Another officer searched the alley below the open apartment window. He observed blood in the snow, which he was able to track to an apartment on the first floor. He radioed for the SWAT team, which subsequently entered the apartment and arrested appellant.

Sergeant LeClaire sustained two gunshot wounds, each from a .45 caliber bullet. The first shot was to his abdomen, striking his external iliac artery. Without immediate medical attention, this wound was fatal; however, Sergeant LeClaire would have been able to speak and fire his weapon for several

bullet that struck Sergeant DeSandro's hand also struck Sergeant LeClaire.

minutes before sustaining fatal blood loss. The second wound was also fatal; it penetrated the left side of Sergeant Le-Claire's forehead, passing through the left side of his brain and lodging between his scalp and skull.

Despite an extensive search of the area the day of the shooting, the gun used to kill Sergeant LeClaire was not found. Police attempted to search a drain near where appellant entered the lower-level apartment, but the magnet used to recover evidence stuck to the sides of the drain, rendering it ineffective. Police returned over a year later and lowered a camera into the drain, revealing what appeared to be a gun inside. The drain was cut, and a gun was recovered with the magazine still inside, the hammer cocked, and one bullet in the chamber. Due to corrosion, the Commonwealth's ballistics expert could not say conclusively that it was the gun used to kill Sergeant LeClaire, although it was a .45 caliber with a seven-round magazine and matched Hutchinson's description of a gun owned by appellant. A loaded .32 caliber revolver, 19 spent .45 caliber casings and 18 unfired .45 caliber bullets were recovered in the apartment. Blood found on a .45 caliber ammunition box located on the sofa near Sergeant LeClaire's location was matched to appellant through DNA analysis.

The Commonwealth charged appellant with murder, three counts of aggravated assault, and related crimes. A jury convicted him of three counts of aggravated assault and possession of a firearm by a convicted felon; the jury could not reach a verdict on the murder charge. As a third-strike offender, appellant received two life sentences for two of the aggravated assault charges, 25 to 50 years imprisonment on the third aggravated assault charge, and five to 10 years imprisonment on the firearms violation. Retrial on the murder charge resulted in a conviction of first degree murder.

The jury found two aggravating circumstances: the victim was a law enforcement officer, 42 Pa.C.S. § 9711(d)(1); and appellant had a significant history of felony convictions. *Id.*, § 9711(d)(9). One or more of the jurors found the "catch-all" mitigating circumstance, "other evidence of mitigation con-

cerning the character and record of the defendant and the circumstances of his offense." *Id.*, § 9711(e)(8).[2] The jury found the aggravating circumstances outweighed the mitigating circumstances; accordingly, the sentence was death. *See id.*, § 9711(c)(iv) (verdict must be sentence of death if jury finds aggravating circumstances outweigh mitigating circumstances).

When a death sentence is imposed, "this Court has an obligation to review the record to ensure the evidence sufficiently supports the first degree murder conviction and the finding of aggravating circumstances, and that the sentence was not the product of passion, prejudice, or other arbitrary factors." *Commonwealth v. Dick,* 602 Pa. 180, 978 A.2d 956, 958 (2009) (citing 42 Pa.C.S. § 9711(h)(3)(i)-(ii)). Appellant additionally raises the following issues: the evidence was insufficient to support a finding that he acted with malice; the verdict was not supported by the weight of the evidence; and the trial court erred in refusing to instruct the jury on the mitigating circumstance that he was acting under extreme mental or emotional distress at the time of the offense.

*Sufficiency of the Evidence*

Appellant first challenges the sufficiency of the evidence to support his first degree murder conviction. Specifically, appellant argues the evidence was insufficient to prove he acted with malice because his use of force was in self-defense. In determining whether there was sufficient evidence to support a jury's finding, we are "obliged to determine whether the evidence presented at trial and all reasonable inferences derived therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to satisfy all elements of the offense beyond a reasonable doubt." *Commonwealth v. Brown,* 605 Pa. 103, 987 A.2d 699, 705 (2009) (citing *Commonwealth v. Baumhammers,* 599 Pa. 1, 960 A.2d 59, 68 (2008)). To convict a defendant of first degree

**2.** The jury also considered the aggravating circumstance that appellant, in the commission of the offense, knowingly created a grave risk of death to another, *id.*, § 9711(d)(7), and the mitigating circumstance that appellant acted under extreme duress, *id.*, § 9711(e)(5), but no juror found either.

murder, the Commonwealth must prove: a human being was unlawfully killed; the defendant was responsible for the killing; and the defendant acted with malice and a specific intent to kill. *See* 18 Pa.C.S. § 2502(a); *Brown*, at 705; *Commonwealth v. Sherwood*, 603 Pa. 92, 982 A.2d 483, 491–92 (2009) (citations omitted). The Commonwealth may use solely circumstantial evidence to prove a killing was intentional, and the fact-finder "may infer that the defendant had the specific intent to kill the victim based on the defendant's use of a deadly weapon upon a vital part of the victim's body." *Brown*, at 705 (quoting *Commonwealth v. Blakeney*, 596 Pa. 510, 946 A.2d 645, 651 (2008)). Malice, as well, may be inferred from the use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Gardner*, 490 Pa. 421, 416 A.2d 1007, 1008 (1980) (citations omitted).

We find the Commonwealth provided sufficient evidence to prove each element of first degree murder. Appellant opened fire on the Warrant Unit when they were only a few feet inside the door. Appellant shot Sergeant LeClaire twice in a vital part of the body. Two other officers were shot before retreating from the apartment. Despite the fatal wound to his abdomen, Sergeant LeClaire was able to call for help and yell "officer down" for a period of time; appellant reloaded his gun, and shot Sergeant LeClaire in the forehead. Appellant's blood was found in several locations in the apartment, including on a box of ammunition on the couch near where Sergeant LeClaire was found.

To show motive for firing upon the officers, the Commonwealth introduced a letter appellant wrote to his wife while incarcerated in 2002. The letter stated, in relevant part, "I don't know where my road is going to lead to . . . for I see my future on the run. . . . I don't believe I can do a long period of time in jail. . . . I believe that the police will have to kill me before I come back to jail." N.T. Trial, 3/9/06, at 99–101.

Dr. Edwin Lieberman of the Philadelphia Medical Examiner's office conducted the autopsy of Sergeant LeClaire. He testified Sergeant LeClaire died from the two gunshot wounds. While either wound was fatal, Dr. Lieberman testi-

fied the wound to the abdomen would have occurred first, as Sergeant LeClaire was able to speak and move for at least some time. The bullets responsible for both wounds were recovered; ballistics identified them as .45 caliber bullets shot from the same gun as the other .45 caliber bullets recovered at the crime scene. This evidence is sufficient to support a jury's finding that Sergeant LeClaire was unlawfully killed, appellant killed him, and he acted with malice and a specific intent to kill.

■■ Despite shooting Sergeant LeClaire twice, appellant argues the Commonwealth did not prove he acted with malice because his use of force was justified. Appellant maintains he fired upon the officers in self-defense,[3] or at the least, imperfect self-defense.[4] He claims he was in the bedroom counting money when he heard someone at the door. He asserts he did not know they were officers as they did not identify themselves as such. Additionally, citing the time of night, the low lighting conditions, and the fact that not all of the officers were in uniform or were in dark uniform, he claims he only saw shadowy figures enter his home. He also claims he saw someone place their arm around Hutchinson's neck and put a gun to her head. Appellant alleges these circumstances caused him to believe he was the victim of a home invasion. He claims, as he began moving to confront the shadowy figures, he was shot in the arm, then in the knee. The shot to the knee caused him to fall to the floor, where he happened to find a loaded gun, and returned fire. He tried to follow Hutchinson out the front door, but when he got to the doorway, two people on opposite sides of the hallway started shooting at him. He then heard one person say to the other, "You hit me, man," to which the other replied, "No, you shot

3. Generally, the use of force "is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force" by another. 18 Pa.C.S. § 505(a). However, deadly force is not justified when the defendant provoked the use of force against himself. *Id.*, § 505(b)(2)(i).

4. Imperfect self-defense occurs when the defendant unreasonably believes he was justified in using deadly force and all other elements for self-defense are satisfied. *Commonwealth v. Tilley*, 528 Pa. 125, 595 A.2d 575, 582 (1991).

me, man." N.T. Trial, 3/9/06, at 87. At that point, he returned inside the apartment, shot the lock off the window, pulled the security bars off, and escaped to the ground below.

█ If a defendant introduces evidence of self-defense, the Commonwealth bears the burden of disproving the self-defense claim beyond a reasonable doubt. *Commonwealth v. Rivera,* 603 Pa. 340, 983 A.2d 1211, 1221 (2009). "Although the Commonwealth is required to disprove a claim of self-defense ... a jury is not required to believe the testimony of the defendant who raises the claim." *Commonwealth v. Carbone,* 524 Pa. 551, 574 A.2d 584, 589 (1990).

Viewing the facts in the light most favorable to the Commonwealth, we find the Commonwealth disproved appellant's claim of self-defense beyond a reasonable doubt. The Warrant Unit knocked on the door, identified themselves, and announced their purpose for over a minute. All of the officers wore ballistics vests identifying who they were on both the front and the back. They were finally let in by Hutchinson, who stated she knew they were officers. Hutchinson also stated the officers never threatened her. Although there were only a few sources of light in the apartment at that time, the officers were able to see well enough without their flashlights. When the officers were only a few feet into the apartment, appellant opened fire on them, immediately wounding Sergeant LeClaire. The other officers retreated to find cover, and more shots were exchanged. Hutchinson testified that while she was still in the apartment she could hear Sergeant LeClaire yell "officer down." Appellant also refused to obey the officers' commands to drop his weapon. At some point, appellant reloaded his gun and continued firing, eventually shooting Sergeant LeClaire in the head. As appellant was the aggressor, he was not justified in using deadly force; accordingly, his self-defense and imperfect self-defense claims fail.

*Weight of the Evidence*

█ Appellant claims the verdict was against the weight of the evidence because the evidence presented at trial demon-

strated, at worst, he mistakenly believed his home was being invaded, causing him to use deadly force. He relies on the same facts discussed in his challenge to the sufficiency of the evidence: he claims he and Hutchinson were not aware it was the police knocking on the door; the lighting conditions made it difficult for him to ascertain who entered his home; and, due to the early morning hour and the fact that he was counting money in the bedroom, he believed he was the victim of a home invasion. Appellant argues his belief that his home was being invaded was reasonable and should negate the inference of malice used to convict him. Appellant's Brief, at 13 (citing *Commonwealth v. Bracey*, 568 Pa. 264, 795 A.2d 935, 947 (2001)).

A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. *Rivera*, at 1225 (citation omitted). Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence. *See id.* (citation omitted). It is well settled that the jury is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the jury's verdict is so contrary to the evidence that it shocks one's sense of justice. *Commonwealth v. Diggs*, 597 Pa. 28, 949 A.2d 873, 879 (2008). "In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion." *Id.*

By virtue of the verdict, it is clear the jury did not find appellant's self-serving self-defense testimony credible. It is also clear, in light of the extensive testimony and ballistics evidence offered by the Commonwealth, that the jury's verdict does not shock one's sense of justice. As the trial court noted in assessing appellant's weight of the evidence claim:

[T]he evidence presented by the Commonwealth ... was not only sufficient to sustain the verdict, but also to satisfy

the interests of justice. In spite of [appellant's] testimony at trial that he did not know who was at his apartment door and that he was shot at first, the evidence demonstrated otherwise, and the jury concluded otherwise.

Trial Court Opinion, 10/10/07, at 11. Appellant fired no less than 19 shots at the officers, requiring him to reload his gun at least once. He shot Sergeant LeClaire in the abdomen and later shot him in the head; he also wounded two other officers. He then fled out of a window and hid from police, rather than seek their assistance. Accordingly, we find the trial court did not abuse its discretion in rejecting appellant's weight of the evidence claim.

*Refusal to Instruct on a Mitigating Circumstance*

▆▆▆ Appellant argues the trial court erred in refusing to instruct the jury on the mitigating circumstance found in 42 Pa.C.S. § 9711(e)(2)—the defendant was under the influence of extreme mental or emotional disturbance. Appellant claims because the trial court instructed the jury on duress based upon his testimony that he was in fear for his life, it should have also found that there was some evidence indicating he was acting under an extreme emotional disturbance. He notes the jury was concerned about the effect the events had on his behavior, as it requested additional guidance from the court regarding the meaning of duress and the time-frame to consider.

A defendant is entitled to an instruction on a mitigating circumstance where the defendant has presented at least some evidence to support it. *See id.,* § 9711(c)(1)(ii). Here, appellant offered no evidence during either the guilt phase or penalty phase to demonstrate he was under the influence of an extreme mental or emotional disturbance. In fact, appellant admitted as much when pressed by the trial court regarding his request for this mitigating circumstance:

The Court: So what about the mitigator number one, the defendant was under the influence of extreme mental emotional disturbance?

Defense Counsel: I think that both of those are available to the jury based on the testimony that the defendant presented at the penalty phase regarding the circumstances and his mental state at the time of the incident.

The Court: I thought he said he was happy?

Defense Counsel: No, before this he said. How were you at that time, I was happy. And then did something unusual happen and then he got to the point where he talked about the chaos.

The Court: I thought that came under the defendant acted under extreme duress.

Defense Counsel: I think you are correct but I would like both.

Commonwealth: I don't think there is any evidence to support that one, Judge.

The Court: Which one?

Commonwealth: The extreme mental or emotional disturbance.

The Court: I mean if you or [co-counsel] or [appellant] can articulate how there is anything in this record to demonstrate that you are allowed to have the fact of this mitigator, that the defendant was under the influence, under the influence of extreme mental or emotional disturbance, I will consider it. But right now, I am not seeing that there was anything presented.

Defense Counsel: I have nothing to offer at this time in support of that, your Honor.

Defense Co-counsel: Nothing, Judge.

The Court: [Appellant]?

\* \* \*

[Appellant]: Like something was mentally wrong with me? No.

N.T. Sentencing, 3/13/06, at 136–38. As there was no evidence related to this mitigating circumstance, the trial court did not abuse its discretion in refusing to instruct the jury on it. Moreover, appellant did not object when the court stated it

would not instruct the jury on the extreme mental or emotional disturbance mitigator, nor did he object at the time the instructions were given to the jury. Accordingly, this claim is waived. *See* Pa.R.Crim.P. 647(B) ("No portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate."); *Commonwealth v. Laird*, 605 Pa. 137, 988 A.2d 618, 646 (2010) (citing *Commonwealth v. Pressley*, 584 Pa. 624, 887 A.2d 220, 223–224 (2005)).

Furthermore, we are not convinced fear is what the Legislature intended when it created the extreme mental or emotional distress mitigator. Indeed, appellant cites no case law supporting this assertion. Our own review of the case law shows this mitigator is generally considered a "mental health mitigator" and usually bundled with 42 Pa.C.S. § 9711(e)(3) (defendant lacked capacity to appreciate criminality of his conduct). A temporary fear for one's life does not seem to equate with the facts and expert testimony typically associated with the "mental health mitigators." *See Commonwealth v. Hughes*, 581 Pa. 274, 865 A.2d 761, 814–15 (2004) (evidence of chronic schizophrenia and expert testimony confirming existence of brain injury would have been sufficient to implicate "mental health mitigators," and remand was necessary for evidentiary hearing assessing reasonableness of counsel's investigation of this mitigating evidence); *Commonwealth v. Rice*, 568 Pa. 182, 795 A.2d 340, 354–55 (2002) (trial court did not err in refusing to give instruction on mitigating circumstance of extreme mental or emotional disturbance where defense's clinical psychologist stated defendant had no signs of severe mental illness or psychotic disturbance and could not offer opinion on defendant's mental state at time of crime); *Commonwealth v. Lester*, 554 Pa. 644, 722 A.2d 997, 1006 (1998) (trial court did not err in refusing to give instruction on mitigating circumstance of extreme mental or emotional disturbance where defendant refused to be examined by psychiatrist).

By this point in the trial, the jury had rejected appellant's version of the facts he now repeats in support of

his theory. Regardless, the court also instructed the jury regarding the catch-all mitigator, 42 Pa.C.S. § 9711(e)(8). The court informed the jury it could consider other evidence of mitigation concerning the character and record of appellant and the circumstances of the offense, which would have included appellant's testimony regarding his fear for his life.

*Statutory Review*

Finally, this Court is required to conduct a statutory review of the death sentence. We must affirm the sentence of death unless we determine: (i) the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or (ii) the evidence fails to support the findings of at least one aggravating circumstance specified in subsection (d). 42 Pa. C.S. § 9711(h)(3). After carefully reviewing the record, we conclude the sentence imposed was not the result of passion, prejudice, or any other factor. Regarding the aggravating factors, the jury found the victim was a law enforcement official and the defendant had a significant history of felony convictions. Appellant did not contest the fact that the victim was a law enforcement official and the evidence produced was sufficient to establish appellant's significant history of felony convictions. One or more jurors also found other evidence of mitigation under the catch-all mitigating circumstance; however, the jury found it did not outweigh the aggravating circumstances. Accordingly, it was statutorily required to impose a sentence of death, *id.*, § 9711(c)(1)(iv), and we affirm the verdict and sentence of death imposed upon appellant by the Court of Common Pleas of Philadelphia County.[5]

Jurisdiction relinquished.

Former Justice GREENSPAN did not participate in the consideration or decision of this case.

5. The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).

Chief Justice CASTILLE and Justices BAER and McCAFFERY join the opinion.

Justice SAYLOR files a concurring and dissenting opinion in which Justice TODD joins.

Justice SAYLOR, concurring and dissenting.

The majority concludes that Appellant waived any objection to the court's refusal to instruct the jury regarding the extreme-mental-disturbance mitigating circumstance.[1] *See* Majority Opinion, at 279, 18 A.3d at 1137. The majority then expresses, in *dictum*, its view that the General Assembly did not intend this mitigator to encompass fear, but only mental-health mitigation. Notably, since there is no basis in subsection (e)(2)'s text for such a limited interpretation, the majority's expression is in tension with generally-accepted principles of statutory construction. *See Commonwealth v. Shafer*, 414 Pa. 613, 621, 202 A.2d 308, 312 (1964) (clarifying that it is improper for this Court to supply omissions in the legislative text, even if the perceived omission may have resulted from inadvertence or lack of foresight by the Legislature). It is also arguably at odds with the United States Supreme Court's general disapproval of limitations on the range of available mitigation. *See, e.g., Eddings v. Oklahoma*, 455 U.S. 104, 114–115, 102 S.Ct. 869, 876–877, 71 L.Ed.2d 1 (1982); *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989); *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (plurality).

I have previously observed that an unduly broad construction of the aggravating circumstances in Pennsylvania's death penalty statute may render it vulnerable to constitutional attack. *See Commonwealth v. Mitchell*, 588 Pa. 19, 84, 902 A.2d 430, 469 (2006) (Saylor, J., concurring). The same logically applies to any unnecessarily narrow construction of the enactment's mitigating circumstances. I find the majority's interpretation here to be unnecessarily narrow because, as noted, there is no support in the statutory text for it. Thus,

---

1. 42 Pa.C.S. § 9711(e)(2) ("The defendant was under the influence of extreme mental or emotional disturbance.").

while I concur in the result reached by the majority based on waiver, I dissent from the implication that the (e)(2) circumstance is confined to mental-health mitigation.

Justice TODD joins this Concurring and Dissenting Opinion.